Filed 6/27/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DEREK RHEINHART,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>NISSAN NORTH AMERICA, INC.,<br>et al.,<br><br>     Defendants and Respondents. | D079940<br><br><br><br>(Super. Ct. No.<br>  37-2020-00015737-CU-CO-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy B. Taylor, Judge.  Reversed.

Law Offices of Robert B. Mobasseri, Robert B. Mobasseri and David Alan Cooper for Plaintiff and Appellant.

Wilson Turner Kosmo, Robert Allen Shields and Hang Alexandra Do for Defendants and Respondents.

Civil Code[1] section 1790.1 of the Song-Beverly Consumer Warranty Act (Song-Beverly Act or at times the Act; § 1790 et seq.) provides that "[a]ny waiver by the buyer of consumer goods of the provisions of this chapter, except as expressly provided in this chapter, shall be deemed contrary to

---

[1]     Undesignated statutory references are to the Civil Code.

public policy and shall be unenforceable and void." (§ 1790.1.) This appeal involves the effect of this antiwaiver provision on a release executed as part of a pre-litigation settlement between plaintiff and appellant Derek Rheinhart and defendants and respondents Nissan North America, Inc. and Mossy Nissan, Inc. (collectively Nissan)[2] over issues that had arisen with Rheinhart's leased Nissan vehicle. After Rheinhart entered into the settlement agreement and release, he filed a lawsuit alleging violations of the Act and seeking repurchase of his vehicle as well as other statutory remedies. Nissan moved for summary judgment on grounds the settlement agreement and release, which Rheinhart admitted he read and had an opportunity to review before signing, extinguished his claims. The trial court granted the motion, finding section 1790.1 applies to waivers of consumer warranties in connection with a product purchase, not to releases negotiated to end disputes about those warranties, and thus rejected Rheinhart's argument that the settlement was unenforceable under section 1790.1.

Rheinhart contends the court erred. He argues the settlement agreement and release violates section 1790.1 and is unenforceable as a matter of law. Rheinhart maintains the court's ruling is contrary to the remedial purpose of the Act and bad public policy in that it defeats the statute's purpose to remove defective vehicles from the road and marketplace. Rheinhart further contends the release is unconscionable given he was not represented by counsel.

Though we reject the trial court's reading of section 1790.1, we do not interpret the Act's antiwaiver provision to categorically prohibit all settlement agreements. However, we conclude under the circumstances of

---

[2] Rheinhart had also sued the lender, Nissan Motor Acceptance Corporation, but he does not challenge the judgment as to that defendant.

2

this case the settlement agreement and release contravenes Rheinhart's substantive rights under the Act and is void and unenforceable as against public policy. We reverse the summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The material facts are undisputed. In June 2019, Rheinhart leased a new Nissan vehicle[3] from Mossy Nissan, paying $6,000 at signing and agreeing to monthly payments of $214.36. Twice in July and once in August 2019 (when the vehicle had only 1,603 miles), he brought the vehicle back to Mossy Nissan, complaining about several issues, including on all three occasions malfunctioning of the rear-view camera screen. Between his first and second visits in July 2019, Rheinhart asked Nissan to repurchase the vehicle. Nissan declined to do so. Before Rheinhart's third visit in August 2019, Nissan offered to pay Rheinhart $2,000, then $2,500 as a compromise. When on August 20, 2019, Rheinhart counteroffered with a demand for $3,548.40, Nissan accepted it. Rheinhart retained the vehicle.

Nissan thereafter sent Rheinhart a written settlement agreement and release (the Release), which Rheinhart reviewed, asking questions about some of its language. In response, Nissan referred him to the Release's language that he "agrees he was given the opportunity to review this Release with a lawyer of his choice and acting on his behalf, and that he has read this Settlement Agreement and Release and fully understand [*sic*] it." Rheinhart, who elected not to consult counsel, signed the Release on October 16, 2019. That same month, he received the settlement check from Nissan.

---

[3] Nissan's separate statement on this basic point does not state the vehicle is new. However, to support this fact, Nissan referred to Rheinhart's complaint, in which Rheinhart alleged the vehicle was new.

3

In part, the Release states that in consideration for Nissan's cash payment, Rheinhart "hereby release[s] and forever discharge[s] Nissan North America, Inc., and all its associated or affiliated companies . . . from any and all claims, lawsuits, liens, debts, dues, damages, judgments. executions and demands of every kind, whether currently known or unknown, and whether arising in the past or present . . . which relate to [Rheinhart's vehicle]." It further provides that Rheinhart "does <u>not</u> waive any unrelated personal injury or breach of warranty claims or causes of action, which may arise <u>after</u> the execution of this Release." In the Release, Rheinhart agreed that in the event Nissan later repurchased his vehicle from him, the repurchase amount would be offset or reduced by the amount Nissan paid in consideration for the Release. The Release states that Nissan North America, Inc. would continue to honor the terms of the car's new vehicle limited warranty.

In May 2020, Rheinhart sued Nissan for violations of the Act. He alleged the vehicle he leased suffered from repeated malfunctions of its dashboard media and safety camera system that had not been repaired, and Nissan "failed in [its] affirmative obligation to repurchase or replace the Vehicle."[4] Among other relief, he sought rescission and restitution of all payments for the vehicle, reimbursement, imposition of civil penalties, attorney fees, and other litigation costs under sections 1793.2, subdivision (d) and 1794.

---

[4] As discussed below, this affirmative obligation (*Kirzhner v. Mercedes-Benz USA, LLC* (2020) 9 Cal.5th 966, 971) of the Song-Beverly Act requires a manufacturer to " 'promptly' repurchase or replace a defective vehicle" (*ibid*.) if, after a reasonable number of attempts, the manufacturer or its representative is unable to repair the vehicle to conform to the applicable express warranty. (§ 1793.2, subd. (d)(2).)

Nissan moved for summary judgment or alternatively summary adjudication of issues. In part, it argued all of the vehicle's nonconformities arising before October 16, 2019, were barred by the Release, which no facts showed was obtained by fraud, deception, misrepresentation, duress or undue influence. Nissan presented evidence that Rheinhart admitted he had read the Release and understood all of its provisions, that he was given an opportunity to review it with an attorney of his choice but did not, and that by signing the Release, he agreed to be bound by it.[5]

In opposition, Rheinhart argued the Release was void as a matter of law under section 1790.1, which deems contrary to public policy, unenforceable and void "[a]ny waiver by the buyer of consumer goods of the provisions of this chapter, except as expressly provided in this chapter . . . ." He cited to federal authorities involving manufacturers' attempted disclaimers of Song-Beverly Act rights (*Gusse v. Damon Corporation* (C.D.Cal. 2007) 470 F.Supp.2d 1110; *Clark v. LG Electronics U.S.A., Inc.* (S.D.Cal., June 7, 2013, No. 13-cv-485) 2013 WL 2476145, as well as cases in the Proposition 65 context (*Consumer Defense Group v. Rental Housing Industry Members* (2006) 137 Cal.App.4th 1185; *Consumer Advocacy Group,*

_____

[5] Nissan also argued there was no evidence that Rheinhart sought to have post-October 16, 2019 nonconformities repaired more than once. It asked the court to "exclude as issues of fact any concerns (in addition to the pre-October 16, 2019 issues which are barred) that were presented to the dealer for repair on just one occasion." Rheinhart responded that he did not rely on any presentations after October 16, 2019, as part of his express warranty claim. His evidence showed that in 2019, before entering into the settlement agreement, he brought his vehicle in at least three times for the same complaint (regarding the asserted backup-camera malfunction), among others. In reply, Nissan did not dispute this evidence; it reiterated its position that any pre-October 16, 2019 alleged defects were barred as a matter of law by the Release.

*Inc. v. Kintetsu Enterprises of America* (2006) 141 Cal.App.4th 46) in which courts reversed settlements or consent judgments reached by the parties due to lack of adequate corrective action. Rheinhart maintained Nissan could not attempt a similar strategy by settling the case and thereby avoiding its affirmative statutory duty under section 1793.2 to offer him a repurchase or replacement of his vehicle. According to Rheinhart, Nissan's failure to abide by its statutory obligations endangered vehicle owners and the public by allowing a malfunctioning and unsafe vehicle to remain on the road. In reply, Nissan objected to some of Rheinhart's evidence.

Overruling Nissan's objections, the trial court granted Nissan's motion. Observing there was no California authority applying the Act's antiwaiver provision, the court ruled "a reasonable and commonsense interpretation of section 1790.1 is that it[ ] applies to waivers of consumer warranties sought *on the front end,* in connection with the purchase of a product—not to releases negotiated to end disputes about those warranties. Indeed, if a lemon law plaintiff is prohibited from waiving the provisions of the Song-Beverly Act in order to settle, no settlement would ever be possible. That would contradict the well-established public policy in California that favors and encourages settlement of litigation. [Citations.] [¶] Accordingly, the Release bars plaintiff's express warranty claim—which is based on the presentations made in June, July, and August 2019—as a matter of law."

Rheinhart filed this appeal from the ensuing judgment.

## DISCUSSION

### I. *Standard of Review*

The applicable review standards are settled: A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a

6

judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) "[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. . . . There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of the fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) The moving party bears the initial burden of production to show the nonexistence of a triable factual issue, and if that party does so, the burden switches to the opposing party to make a prima facie showing that such an issue exists. (*Ibid.*)

"[T]he placement and quantum of the burden of proof at trial [are] crucial for purposes of summary judgment." (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 851.) How the parties moving for and opposing summary judgment may each carry their burden of persuasion and/or production depends on "*which* [party] would bear *what* burden of proof at trial." (*Ibid.*; *Pollock v. Tri-Modal Distribution Services, Inc.* (2021) 11 Cal.5th 918, 946.) Thus, a defendant moving for summary judgment on an affirmative defense has an initial burden of producing evidence to establish a prima facie showing of the nonexistence of any triable issue of material fact as to each element of that defense. (*Aguilar*, at p. 850; Code Civ. Proc., § 437c, subds. (o)(2), (p)(2); *Dagher v. Ford Motor Co.* (2015) 238 Cal.App.4th 905, 914.) If the defendant makes this showing, the burden shifts to the plaintiff to show with admissible evidence that a triable issue of material fact exists. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 850; *Dagher*, at pp. 914-915.)

7

We independently review the record and the trial court's determination, applying the same legal standard as the trial court to determine if there are genuine issues of material fact. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003; *Quidel Corporation v. Superior Court of San Diego County* (2020) 57 Cal.App.5th 155, 164.) We are not bound by the trial court's stated reasoning or rationales. (*County of San Diego v. Superior Court* (2015) 242 Cal.App.4th 460, 467.) " '[W]e view the evidence in a light favorable to the losing party . . . , liberally construing [the] evidentiary submission while strictly scrutinizing the moving party's own showing . . . .' " (*Quidel*, at p 164.) "[A]ny doubts as to the propriety of granting a summary judgment motion should be resolved in favor of the party opposing the motion." (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535; *Quidel*, at p. 164.)

II. *The Act, Manufacturer Obligations and Buyer Remedies*

The Act "was enacted to address the difficulties faced by consumers in enforcing express warranties. Consumers frequently were frustrated by the inconvenience of having to return goods to the manufacturer for repairs and by repeated unsuccessful attempts to remedy the problem. [Citation.] The Act protects purchasers of consumer goods by requiring specified implied warranties, placing strict limitations on how and when a manufacturer may disclaim those implied warranties, and providing mechanisms to ensure that manufacturers live up to the terms of any express warranty." (*Cummins, Inc. v. Superior Court* (2005) 36 Cal.4th 478, 484.) For example, it requires manufacturers to make service and repair facilities available to carry out terms of express warranties, and time frames within which repairs under an express warranty must be provided. (*Id*. at pp. 484-485.)

8

"In those instances when the goods cannot be repaired to conform to an express warranty after a 'reasonable number of attempts,' the Act specifies a remedy, in what has been referred to as the 'refund-or-replace' provisions." (*Cummins Inc. v. Superior Court, supra*, 36 Cal.4th at p. 485, citing in part § 1793.2., subd. (d)(1) & (2).) In the case of new motor vehicles under warranty with defects, "[t]he Act allows buyer or lessees . . . of [such vehicles] the manufacturer is unable to repair after a reasonable number of attempts to elect one of two remedies: Consumers may choose either a replacement vehicle or restitution 'in an amount equal to the actual price paid or payable by the buyer.'" (*Kirzhner v. Mercedes-Benz USA, LLC, supra*, 9 Cal.5th at p. 969.)[6]

---

[6] " 'A defect or nonconformity for purposes of Song-Beverly is defined as "a nonconformity which substantially impairs the use, value, or safety of the new motor vehicle to the buyer or lessee." ' " (*Anderson v. Ford Motor Co.* (2022) 74 Cal.App.5th 946, 959, fn. 3; see § 1793.22, subd. (e)(1).) "The reasonableness of the number of repair attempts is a question of fact to be determined in light of the circumstances, but at a minimum there must be more than one opportunity to fix the nonconformity. . . . Each occasion that an opportunity for repairs is provided counts as an attempt, even if no repairs are actually undertaken." (*Robertson v. Fleetwood Travel Trailers of California, Inc.* (2006) 144 Cal.App.4th 785, 799.) Section 1793.22, subdivision (b) gives rise to a rebuttable presumption as to the reasonable number of repair attempts under various circumstances including, if, in the first 18 months or 18,000 miles, the same defect/nonconformity "results in a condition that is likely to cause death or serious bodily injury if the vehicle is driven and the nonconformity has been subject to repair two or more times by the manufacturer . . . ." (§ 1793.22, subd. (b)(1).) In situations not involving a condition causing death or serious bodily injury, the presumption will arise if "[t]he same nonconformity has been subject to repair four or more times by the manufacturer . . . ." (§ 1793.22, subd. (b)(2).) This presumption affects the burden of proof. (§ 1793.22, subd. (b)(2); *Jiagbogu v. Mercedes-Benz USA* (2004) 118 Cal.App.4th 1235, 1244-1245.) In its reply brief, Nissan did not dispute Rheinhart's characterization of the backup camera malfunctioning as a "serious safety issue."

9

Specifically, "[s]ection 1793.2, subdivision (d)(2) sets forth the manufacturer's affirmative obligation to 'promptly' repurchase or replace a defective vehicle it is unable to repair . . . ." (*Kirzhner v. Mercedes-Benz USA, LLC*, *supra*, 9 Cal.5th at p. 971.) Under that section, "if a manufacturer is 'unable to service or repair a new motor vehicle . . . to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle in accordance with subparagraph (A) or promptly make restitution to the buyer in accordance with subparagraph (B).' In turn, the restitution remedy in section 1793.2, subdivision (d)(2)(B) states that 'the manufacturer shall make restitution in an amount equal to the actual price paid or payable by the buyer, . . . including any collateral charges such as sales or use tax, license fees, registration fees, and other official fees, plus any incidental damages to which the buyer is entitled under [s]ection 1794, including, but not limited to, reasonable repair, towing, and rental car costs actually incurred by the buyer.' Finally, section 1794 is the Act's general damages provision, providing that a buyer may seek damages for a manufacturer's 'failure to comply with any obligation under this chapter or under an implied or express warranty,' the measure of which includes the restitution and replacement remedies as well as the remedies allowed by the California Uniform Commercial Code, including incidental damages." (*Kirzhner v. Mercedes-Benz USA, LLC*, *supra*, 9 Cal.5th at pp. 971-972.) The buyer is "free to elect restitution in lieu of replacement, and in no event shall the buyer be required

10

by the manufacturer to accept a replacement vehicle." (§ 1793.2, subd. (d)(2).)[7]

Once the duty to offer replacement or restitution arises, a manufacturer must "promptly" comply regardless of whether a buyer requests those remedies. (See *Krotin v. Porsche Cars North America, Inc.* (1995) 38 Cal.App.4th 294, 300, 302-303 [Song-Beverly Act "does not *require* consumers to take any affirmative steps to secure relief for the failure of a manufacturer to service or repair a vehicle to conform to applicable warranties—other than . . . permitting the manufacturer a reasonable opportunity to repair the vehicle"; "[T]he consumer's request [for replacement or restitution] is not mandated by any provision in the Act"].) Indeed, once the manufacturer's duty to promptly provide a replacement vehicle or restitution arises after a reasonable number of repair attempts, "the buyer no longer has the same ownership interest in the vehicle since the manufacturer can (and should) replace or repurchase it at any moment." (*Kirzhner v. Mercedes-Benz USA, LLC*, *supra*, 9 Cal.5th at p. 980.) A buyer's unequivocal request for a "vehicle repurchase" is sufficient to trigger a manufacturer's duty to promptly make restitution. (*Lukather v. General Motors, LLC* (2010) 181 Cal.App.4th 1041, 1050.)

"[A] manufacturer's willful failure to promptly provide restitution or a replacement vehicle may result in an award of civil penalties pursuant to

---

[7] A buyer who "prevails in an action" under the Act may recover "costs and expenses, including attorney's fees based on actual time expended, determined by the court to have been reasonably incurred by the buyer in connection with the commencement and prosecution of such action." (§ 1794, subd. (d).) Permitting a prevailing buyer to recover attorney fees is designed to " 'provide[ ] injured consumers strong encouragement to seek legal redress in a situation in which a lawsuit might not otherwise have been economically feasible.' " (*Wohlgemuth v. Caterpillar* (2012) 207 Cal.App.4th 1252, 1262.)

11

section 1794.  [Citations.]  But section 1794 also allows buyers to recover damages for nonwillful violations of the Act.  [Citation.]  Subdivision (a) of section 1794 allows a buyer 'who is damaged by a failure to comply with *any* obligation under [the Act] *or* under an implied or express warranty or service contract' to 'bring an action for the recovery of damages.' " (*Kirzhner v. Mercedes-Benz USA, LLC*, *supra*, 9 Cal.5th at p. 984.)

The Act is " ' "manifestly a remedial measure, intended for the protection of the consumer [and] should be given a construction calculated to bring its benefits into action." ' " (*Kirzhner v. Mercedes-Benz USA, LLC*, *supra*, 9 Cal.5th at p. 972.)

III.  *Public Policies Concerning Settlement Agreements*

California has a strong public policy favoring the voluntary settlement of disputes.  (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 793; *Zamora v. Clayborn Contracting Group, Inc.* (2002) 28 Cal.4th 249, 260 ["the law favors settlements"]; *Kaufman v. Goldman* (2011) 195 Cal.App.4th 734, 745 (*Kaufman*); *Osumi v. Sutton* (2007) 151 Cal.App.4th 1355, 1359 ["[i]t is, of course, the strong public policy of this state to encourage the voluntary settlement of litigation"].)  Settlement agreements "are highly favored as productive of peace and good will in the community, and reducing the expense and persistency of litigation." (*McClure v. McClure* (1893) 100 Cal. 339, 343.)

Notwithstanding that policy, courts can declare settlement agreements and releases, which the law treats like any other contracts (*Timney v. Lin* (2003) 106 Cal.App.4th 1121, 1127), void and unenforceable on the basis of other public policies, illegality or unfairness.  (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 777 & fn. 53 [agreement purporting to release liability for future gross negligence against disabled child violates

public policy and is unenforceable]; *California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1990) 50 Cal.3d 658, 664 [court may reject a stipulated settlement that is contrary to public policy or that incorporates an erroneous rule of law]; *Kaufman, supra*, 195 Cal.App.4th at p. 746; *Graylee v. Castro* (2020) 52 Cal.App.5th 1107, 1114-1115 [courts cannot " 'endorse or enforce a provision in a settlement agreement or stipulation which is illegal, contrary to public policy, or unjust' "], quoting *Timney*, at p. 1127; see generally *Vitatech Internat., Inc. v. Sporn* (2017) 16 Cal.App.5th 796, 807 [" '[A] court cannot validly enter a judgment or order which is void even if the parties agree to it' "]; § 3513 ["[A] law established for a public reason cannot be contravened by a private agreement"]; *Azteca Construction, Inc. v. ADR Consulting, Inc.* (2004) 121 Cal.App.4th 1156, 1166 ["[A] party may waive a statutory right where its ' "public benefit . . . is merely incidental to [its] primary purpose," ' but a waiver is unenforceable where it would ' "seriously compromise any public purpose that [the statute was] intended to serve" ' "].)

These principles apply to other types of favored contracts or contractual provisions. (See *Verdugo v. Alliantgroup, L.P.* (2015) 237 Cal.App.4th 141, 146-147 (*Verdugo*) [California courts will not give effect to a contractual forum selection clause, normally favored under California law, " 'if to do so would substantially diminish the rights of California residents in a way that violates our state's public policy' "; citing cases]; *Wimsatt v. Beverly Hills Weight etc. Internat., Inc.* (1995) 32 Cal.App.4th 1511, 1522 (*Wimsatt*); *Hall v. Superior Court* (1983) 150 Cal.App.3d 411, 417-418 [choice of forum clause in private securities agreement unenforceable as violating public policy].) " ' "A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy

13

against the enforcement of such terms." ' " (*Dunkin v. Boskey* (2000) 82 Cal.App.4th 171, 183.)

To invalidate a contract on this ground, the public policy violation must be " ' "entirely plain . . . ." ' " (*City of Santa Barbara v. Superior Court, supra,* 41 Cal.4th at p. 777, fn. 53.) " ' " 'The power of the courts to declare a contract void for being in contravention of sound public policy . . . should be exercised only in cases free from doubt' " ' " (*ibid.*; *Kaufman, supra,* 195 Cal.App.4th at p. 746) and where the contract is " 'clearly injurious to the interests of society.' " (*City of Santa Barbara,* at p. 777, fn. 53.)

The court in *Timney v. Lin, supra,* 106 Cal.App.4th 1121 invalidated an otherwise illegal forfeiture clause despite the parties inclusion of it in a settlement agreement. (*Id.* at p. 1123 ["we hold that an illegal forfeiture provision is unenforceable, even if the illegal provision is included in a settlement agreement"].) The lower court had enforced the settlement agreement under Code of Civil Procedure section 664.6, but *Timney,* pointing to case law involving stipulated judgments, held that statute "does not allow a court to endorse or enforce a provision in a settlement agreement or stipulation which is illegal, contrary to public policy, or unjust." (*Id.* at p. 1127, citing *California State Auto. Assn. Inter–Ins. Bureau v. Superior Court, supra,* 50 Cal.3d at p. 664 [involving a stipulated judgment; " 'the court cannot surrender its duty to see that the judgment to be entered is a just one' "] & *Plaza Hollister Ltd. Partnership v. County of San Benito* (1999) 72 Cal.App.4th 1, 12-13 ["court cannot validly enter a judgment or order which is void even if the parties agree to it"].)

*Timney* held "even though there is a strong public policy favoring the settlement of litigation, this policy does not excuse a contractual clause that is otherwise illegal or unjust." (*Timney v. Lin, supra,* 106 Cal.App.4th at p.

14

1127.) "[O]ur Supreme Court and other California courts have rejected the notion that a settlement judge may properly act to 'approve' an illegal contract and thereby shield it from invalidation. [Citations.] We have found no case, and the parties have cited none, holding an illegal forfeiture provision may be enforced by the courts, even as part of a settlement agreement. Applying legal principles pertinent to all contracts, the deposit forfeiture provision in issue is invalid as constituting a forbidden forfeiture." (*Id*. at p. 1129.)

IV. <i>The Effect of Statutory Antiwaiver Provisions</i>

"A public policy that cannot be waived qualifies as fundamental." (*G Companies Management, LLC v. LREP Arizona, LLC* (2023) 88 Cal.App.5th 342, 353.) Statutory antiwaiver provisions intended to promote consumer and other public protections, like section 1790.1 here, reflect competing important public policies that can impact the enforceability of a contractual provision. (See *Crosno Construction, Inc. v. Travelers Casualty and Surety Company of America* (2020) 47 Cal.App.5th 940, 951 [section 8122 antiwaiver provision in statutory scheme to resolve payment disputes in construction contracts]; *Verdugo, supra,* 237 Cal.App.4th 141 [Labor Code section 219, subdivision (a) antiwaiver provision covering rights and remedies relating to employee compensation, providing "no provision of this article can in any way be contravened or set aside by a private agreement, whether written, oral, or implied"]; *1-800-Got Junk? LLC v. Superior Court* (2010) 189 Cal.App.4th 500, 517-518 [California Franchise Relations Act (CFRA) section 20010, providing: "Any condition, stipulation or provision purporting to bind any person to waive compliance with any provision of this law is contrary to public policy and void"; but holding antiwaiver statute did not invalidate parties' choice of Washington law provision because Washington afforded

15

franchisee "far greater protection from summary termination of a franchise" than California law, and was not a waiver of compliance with the CFRA]; *America Online, Inc. v. Superior Court* (2001) 90 Cal.App.4th 1, 11 [Consumer Legal Remedies Act (CLRA) antiwaiver provision providing that "[a]ny waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void"]; *Wimsatt, supra,* 32 Cal.App.4th at pp. 1513, 1520-1522 [antiwaiver provision in California Franchise Investment Law (Corp. Code, § 31512) providing: "Any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this law or any rule or order hereunder is void"]; *Hall v. Superior Court, supra,* 150 Cal.App.3d at pp. 417-418 [antiwaiver provision in Corporate Securities Law voiding " '[a]ny condition, stipulation or provision purporting to bind any person acquiring any security to waive compliance with any provision of this law' "];[8] *Kaufman, supra,* 195

---

[8]     Our sister division in *Hall v. Superior Court* relied on *Wilko v. Swan* (1953) 346 U.S. 427 to invalidate on public policy grounds the choice of forum clause in a private securities agreement based on this antiwaiver statute. (*Hall v. Superior Court, supra,* 150 Cal.App.3d at p. 418.)  The United States Supreme Court overruled *Wilko* in *Rodriguez de Quijas v. Shearson/*

16

Cal.App.4th at p. 744 [antiwaiver provision in city rent stabilization ordinance, providing:  "Any waiver by a tenant of rights under this Chapter shall be void as contrary to public policy", italics omitted]; accord, *G Companies Management, LLC v. LREP Arizona, LLC*, *supra*, 88 Cal.App.5th at p. 352 [usury law provision (§ 1916-2) specifying that if an agreement or contract contains a provision requiring interest in excess of the allowable rate, it " 'shall be null and void as to any agreement or stipulation therein contained to pay interest . . . .' "].)

Such antiwaiver provisions in consumer protection laws are "[o]ne of the most important protections California offers its . . . citizens . . . ." (*Wimsatt*, *supra,* 32 Cal.App.4th at p. 1520; see also *Verdugo*, *supra*, 237

---

*American Exp., Inc.* (1989) 490 U.S. 477, finding *Wilko* to be "pervaded by . . . 'the old judicial hostility to arbitration . . . .' " (*Rodriguez*, at p. 480.)  In *Rodriguez*, the court declined to interpret an antiwaiver provision in section 14 of the Securities Act of 1933 (15 U.S.C. § 77n, prohibiting a binding stipulation "to waive compliance with any provision" of the Act; *Rodriguez*, at p. 477) to prohibit agreements to arbitrate future disputes relating to the purchase of securities.  The court observed that " '[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.' " (*Id*. at p. 481.)  Further, *Rodriguez* stated the right to select the judicial forum and wider choice of courts were "not such essential features" of the Securities Act that the antiwaiver clause was properly construed to bar any waiver of those provisions.  (*Id*. at p. 481.)  "Nor are they so critical that they cannot be waived under the rationale that the Securities Act was intended to place buyers of securities on an equal footing with sellers." (*Ibid*.)  It found "no sound basis for construing the prohibition in [section] 14 . . . to apply to these procedural provisions." (*Id*. at p. 482.)  The court in *Rodriguez*, however, left open a party's ability to demonstrate that the arbitration agreement resulted from " 'the sort of fraud or overwhelming economic power that would provide grounds "for the revocation of any contract." ' " (*Id*. at pp. 483-484.)  Here, the Act's remedies for buyers are not mere procedural provisions but are critical, essential features of the Act.

Cal.App.4th at p. 149.) In *Wimsatt*, involving California's Franchise Investment Law, the court held as a matter of first impression that when "determining the 'validity and enforceability' of forum selection provisions in franchise agreements," a different set of burdens apply. (*Id*. at pp. 1521-1522.) Given legislative recognition of franchisees' need for special protection, as well as the need to prevent easy circumvention of the antiwaiver statute, *Wimsatt* decided the law put the burden on the franchisor to show that litigation in the contract forum will not diminish in any way the substantive rights afforded California franchisees under California law. (*Id*. at p. 1522.)

It is useful to consider decisions assessing the impact of antiwaiver statutes on contractual provisions or contracts. This court in *Crosno Construction, Inc. v. Travelers Casualty and Surety Company of America*, *supra*, 47 Cal.App.5th 940 decided the issue in a summary judgment context, affirming a lower court's ruling invalidating a provision in a construction subcontract. The antiwaiver statute there, section 8122, was included in a statutory scheme to resolve payment disputes in construction projects, what we described as "expansive remedial legislation to protect subcontractors . . . ." (*Id*. at pp. 950, 961.) *Crosno* declined to enforce a "pay-when-paid" subcontract provision as doing so would "postpone [the cross-complainant's] right to recover under the payment bond for an indefinite time period until" certain litigation concluded, and that result would

18

"unreasonably affect or impair [the cross-complainant's] statutory payment bond remedy . . . ." (*Id.* at p. 946.)[9]

*Verdugo, supra,* 237 Cal.App.4th 141 involved a mandatory forum selection clause in a plaintiff's employment agreement designating Texas as the exclusive forum for employment and other disputes. (*Id.* at pp. 144, 146.) Forum selection clauses are favored in California if voluntarily entered into and their enforcement is not unreasonable. (*Handoush v. Lease Finance Group, LLC* (2019) 41 Cal.App.5th 729, 734, quoting *America Online Inc. v. Superior Court*, *supra*, 90 Cal.App.4th at p. 11; *Verdugo*, at p. 147.) The plaintiff in *Verdugo* brought a class action, and the defendant successfully moved to stay or dismiss it under the forum selection clause, which the trial court found was enforceable. (*Id.* at p. 146.)

The appellate court reversed, holding the forum selection clause unenforceable as against public policy. (*Verdugo*, *supra,* 237 Cal.App.4th at pp. 144, 162, fn. 10.) *Verdugo* adopted *Wimsatt*'s shifting burden rationale,

_____

9 Unlike section 1790.1 here, the antiwaiver clause in *Crosno* expressly permitted a written waiver and release, providing: " 'An owner, direct contractor, or subcontractor may not, by contract or otherwise, waive, affect, or impair any other claimant's rights under this part, whether with or without notice, and any term of a contract that purports to do so is void and unenforceable unless and until the claimant executes and delivers a waiver and release under this article.' " (*Crosno Construction, Inc. v. Travelers Casualty and Surety Company of America, supra,* 47 Cal.App.5th at p. 951.) And *Crosno* made clear it was not invalidating all pay-when-paid provisions: "We do not suggest that *every* pay-when-paid provision is unenforceable as an impairment of payment bond rights under section 8122. Instead, we conclude that this one is unenforceable because it unreasonably forestalls accrual of Crosno's payment bond rights for an indefinite period of time while the direct contractor pursues litigation against the owner." (*Id.* at p. 960.)

19

explaining that ordinarily the party opposing enforcement of a forum selection clause bears the burden of proving why it should not be enforced. (*Verdugo*, at pp. 144, 147.)  But that burden is reversed "when the claims at issue are based on unwaivable rights created by California statutes.  In that situation, the party seeking to enforce the forum selection clause bears the burden to show litigating the claims in the contractually-designated forum 'will not diminish in any way the substantive rights afforded . . . under California law.' " (*Verdugo, supra,* at p. 147; see also *America Online, Inc. v. Superior Court*, *supra*, 90 Cal.App.4th at p. 10 [party seeking enforcement must "prove that enforcement of the forum selection clause would not result in a significant diminution of rights"].)

The court observed all of the plaintiff's claims were based on Labor Code statutory rights (pertaining to when and how employers must (1) pay overtime and other forms of compensation, (2) provide meal and rest breaks, and (3) provide accurate wage statements), which were "important statutory rights the Legislature made unwaivable through an express antiwaiver provision." (*Verdugo, supra*, 237 Cal.App.4th at p. 156; see Lab. Code, § 219, subd. (a) [declaring such rights cannot "in any way be *contravened or set aside* by a private agreement, whether written, oral, or implied" (italics added)].)[10]  The statutory provisions "further[ed] California's fundamental public policy of requiring California employers to fully and promptly pay all wages due their employees." (*Id*. at p. 156.)  They also established specific

---

[10]    *Verdugo* found it irrelevant that the Labor Code antiwaiver provision did not include the words "waiver" or "void"; the appellate court found the statute had the same legal effect as the antiwaiver provisions in the Franchise Investment Law and CLRA.  (*Verdugo*, *supra*, 237 Cal.App.4th at p. 152.)  "[C]ase law uniformly recognizes these statutory provisions make the rights unwaivable."  (*Ibid*.)

remedies for an employer's violation of these provisions, including recovery of unpaid wages, interest, civil penalties, and attorney fees.  (*Id*. at p. 145.)

*Verdugo* explained that putting the burden of proof on the defendant was intended "to prevent the forum selection clause from operating as a waiver of [plaintiff's] unwaivable Labor Code rights . . . ."  (*Verdugo, supra,* 237 Cal.App.4th at p. 151.)  The court stated the forum selection clause at issue "has the potential to contravene an antiwaiver statute designed to protect California residents from business practices that do not meet Labor Code standards.  If enforced, the forum selection clause would require [the plaintiff] to litigate her Labor Code wage claims in Texas, where the Employment Agreement's choice-of-law clause would require the court to apply Texas law unless a Texas court decides not to enforce the choice-of-law clause."  (*Ibid*.)  Although the defendant contended that the Texas court would " 'most likely' " apply California law to employee's claims (*id*. at p. 158), it preserved its ability to argue to the Texas court that Texas law should apply.  (*Ibid*.)  Further, its arguments constituted "conclusory speculation" that did not satisfy its  burden of proof.  (*Ibid*.)  "As explained above, [the defendant] must show enforcing the forum selection clause '*will not diminish in any way*' [the plaintiff's] statutory rights."  (*Ibid,* quoting *Wimsatt, supra,* 32 Cal.App.4th at p. 1522 & *America Online, supra,* 90 Cal.App.4th at pp. 10-11.)  The defendant "carefully avoid[ed] making any specific and definitive argument that Texas courts either have applied or will apply California wage and hour laws despite a choice-of-law clause designating Texas law."  (*Verdugo*, at p. 158.)  Because the defendant declined the opportunity to eliminate uncertainty by refusing to stipulate that California law applied, the Court of Appeal held the forum-selection clause was unenforceable as against public policy.  (*Id*. at pp. 160, 162, fn. 10.)

21

Reaching a different conclusion in landlord/tenant contexts, the First District, Division One Court of Appeal in *Kaufman*, *supra*, 195 Cal.App.4th 734 and *Geraghty v. Shalizi* (2017) 8 Cal.App.5th 593 (*Geraghty*) declined to invalidate settlement/lease buyout agreements despite an antiwaiver provision in a city rent ordinance providing "[a]ny waiver by a tenant of rights under this Chapter [except as provided in San Francisco Administrative Code section 37.10A, subdivision (g),] shall be void as contrary to public policy." (*Kaufman*, at p. 744, italics omitted; S.F. Admin. Code, § 37.9, subd. (e); *Geraghty*, at p. 599.) *Kaufman* involved settlement of a landlord's unlawful detainer action against a tenant. (*Kaufman*, at pp. 737-738.) As part of the settlement, the tenant agreed to move out after seven years. (*Id*. at p. 738.) She also acknowledged she was waiving any future possession rights, including rights she might have under the ordinance. (*Ibid*.) Years later, in 2008, when the tenant would not leave, the landlord sued to enforce their settlement agreement. (*Id*. at pp. 738-739.) On the parties' cross-motions, the trial court granted summary adjudication in the landlord's favor. (*Id*. at p. 739.)

On appeal, the tenant argued the settlement agreement's move-out provision was a void waiver of her rights under the rent ordinance, and enforcing the agreement would violate public policy. (*Kaufman*, *supra*, 195 Cal.App.4th at pp. 743-744.) The appellate court rejected the arguments and affirmed the order granting summary adjudication, holding the ordinance, which only voided waivers "in the context of an eviction or an owner move-in," did not apply "to the settlement of a legal claim that was made for valuable consideration in return for termination of litigation." (*Id*. at p. 745.) It continued: "Parties frequently settle landlord-tenant disputes, and move-out provisions are not uncommon. If [the antiwaiver provision] were deemed

to apply to such move-out provisions, this would have a chilling effect on future settlements of unlawful detainer actions as landlords would have little incentive to enter into prelitigation negotiations." (*Ibid.*, fn. omitted.) The court concluded: "[W]e agree that the public policy in favor of protecting tenants is important. But the time to raise this issue is when a settlement agreement is negotiated with advice of counsel, not seven years after a tenant has enjoyed the benefits of the bargain." (*Id.* at p. 746.)

*Kaufman* relied on the strong public policy favoring settlement of disputes, recognizing a contract should be voided only when the situation is free from doubt: " 'Freedom of contract is an important principle, and courts should not blithely apply public policy reasons to void contract provisions.' " (*Kaufman*, *supra*, 195 Cal.App.4th at p. 745.) In reaching its holding, the *Kaufman* court found *Timney v. Lin*, *supra*, 106 Cal.App.4th 1121 inapplicable, as *Timney* involved an illegal forfeiture clause that was not present in the settlement agreement before it. (*Kaufman*, at p. 746.) *Kaufman* also rejected reliance on *Consumer Advocacy Group, Inc. v. Kintetsu Enterprises of America*, *supra*, 141 Cal.App.4th 46, stating only it "concerns a Proposition 65 consent judgment." (*Kaufman*, at p. 746, fn. 7.) *Geraghty* relied on *Kaufman* to affirm a summary judgment for a landlord based on a pre-litigation lease buy-out agreement he had reached with his tenant. (*Geraghty*, *supra*, 8 Cal.App.5th at p. 595 [rejecting tenant's claim the release was void; "For the same reasons expressed in *Kaufman*, we conclude the parties should be held to the terms of their negotiated disposition, which afforded benefits to both and avoided burdening the court with a lawsuit"].)

V. *The Release Here Is Void as Against Public Policy*

We apply *Wimsatt* and *Verdugo* to the circumstances here. That the Act is "strongly pro-consumer" (*Murillo v. Fleetwood Enterprises, Inc.* (1998)

23

17 Cal.4th 985, 990) is reflected in its above-referenced antiwaiver provision, which deems "contrary to public policy" and "unenforceable and void" "[a]ny waiver by the buyer of consumer goods of the provisions of this chapter, except as expressly provided in this chapter . . . ." (§ 1790.1; see *Murillo*, at p. 972; *Duff v. Jaguar Land Rover North America, LLC* (2022) 74 Cal.App.5th 491, 500; *Martinez v. Kia Motors America, Inc.* (2011) 193 Cal.App.4th 187, 195.) The Act's antiwaiver provision is extremely broad; it is not limited to warranties or any particular time frame during the purchase process, but encompasses all mandated remedies afforded to buyers. Such an interpretation follows the directive to give the Act a " ' "construction calculated to bring its benefits into action." ' " (*Kirzhner v. Mercedes-Benz USA, LLC*, *supra*, 9 Cal.5th at p. 972.) We are not bound by the lower court's interpretation of the law, which in our view is overly restrictive.[11]

Here, Rheinhart's right to remedies under the Act are substantive rights that the Legislature has declared unwaivable. Given the nature of those rights, Nissan's summary judgment burden was not just to establish the existence of the Release and its validity, but to show that enforcing the Release would " 'not diminish in any way [Rheinhart's] substantive rights

---

[11] To reiterate, section 1790.1 deems contrary to public policy and void "[a]*ny waiver by the buyer of consumer goods of the provisions of this chapter*" (italics added) unless the Act *expressly* provides otherwise. When statutory language is unambiguous, " 'then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs.' " (*Kirzhner v. Mercedes-Benz USA, LLC*, *supra*, 9 Cal.5th at p. 972.) But as stated below, we do not hold the antiwaiver provision bars parties in Song-Beverly Act cases from ever settling disputes. We may reject a literal construction that would lead to absurd results. (*Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 27.) This appeal gives us no occasion to enumerate the circumstances validating settlements of Song-Beverly Act claims, we simply hold that the Release here contravened Rheinhart's rights to elect the Act's substantive remedies.

afforded . . . under California law' " (*Verdugo, supra*, 237 Cal.App.4th at p. 147) or "would not result in a significant diminution of [those] rights." (*America Online, Inc. v. Superior Court, supra*, 90 Cal.App.4th at p. 10; see also *G Companies Management, LLC v. LREP Arizona, LLC, supra*, 88 Cal.App.5th at p. 350.)  Applying this standard gives effect to the Act's manifestly remedial and consumer protection purposes.

Under the principles discussed above, and the factual circumstances of this case, Nissan cannot meet this burden.[12]  It is undisputed that Rheinhart presented the rear-view camera issue to Nissan on three occasions, and that thereafter Nissan agreed to pay him $3,548.40 in compromise.  There is no evidence that before Nissan presented Rheinhart with the settlement agreement that it advised him of the Act's replacement or restitution

---

[12]     Nissan's motion did not mention, much less discuss, the Act's antiwaiver provision or its impact on Rheinhart's release.  Understandably, Nissan did not address whether Rheinhart's decision to settle for $3,548.40 diminished his substantive rights under the Act, including his entitlement to "prompt" replacement or restitution, damages, civil penalties and attorney fees.  After Rheinhart raised the Act's antiwaiver provision in his summary judgment opposition, Nissan argued his cited authorities, including the Proposition 65 cases, were inapposite; that they had "no bearing on the issues here."  This treatment is akin to the cursory remark by *Kaufman* rejecting reliance on *Consumer Advocacy Group, Inc. v. Kintetsu Enterprises of America, supra*, 141 Cal.App.4th 46.  (*Kaufman, supra*, 195 Cal.App.4th at p. 746, fn. 7.)  The court in *Consumer Advocacy* acknowledged the "general rule that a trial court should not approve an agreement contrary to law or to public policy" as well as the "specific rule that ' "the court cannot surrender its duty to see that the judgment to be entered [on a settlement] is a just one, nor is the court to act as a mere puppet in the matter.' " (*Consumer Advocacy*, at pp. 61-62.)  These principles apply here.  Nissan also asserted that "bargained-for releases are permitted under the Song-Beverly Act."  But the authority it cited for that proposition—*Dorman v. International Harvester Co.* (1975) 46 Cal.App.3d 11, 19—does not discuss or mention the Song-Beverly Act.

25

remedies or the fact Nissan had an affirmative obligation to offer those remedies once it engaged in a reasonable number of repair efforts. There is no indication Nissan's $3,548.40 settlement payment endeavored to approximate the vehicle's purchase price or other sums owed under the Act for reimbursement. There is no evidence otherwise that Rheinhart, who was unrepresented by counsel, was aware of his rights under the Act or its antiwaiver provision. He did not expressly waive his rights under the Act. The circumstances suggest unequal bargaining strength between a consumer unaware of his rights and a manufacturer seeking to circumvent its statutory obligations.

And Rheinhart is unlike the plaintiff in *Kaufman*, who was apparently represented by counsel at the time she entered into the settlement and release, which expressly acknowledged her rights under the rent ordinance. (*Kaufman*, *supra*, 195 Cal.App.4th at pp. 738, 746.) We decline to extend *Kaufman* (or *Geraghty*, which followed *Kaufman*) to these circumstances. In addition to the distinguishing aspects above, *Kaufman* involved unique facts and circumstances in that the tenant waited seven years after entering into the settlement and the court interpreted the antiwaiver provision as only voiding waivers "in the context of an eviction or an owner move-in." (*Id.* at p. 745.) *Kaufman* did not acknowledge a defendant's burden to prove a settlement does not diminish substantive rights when dealing with antiwaiver provisions in the consumer protection context.

On this summary judgment record, the Release contravened Rheinhart's right to elect the Act's substantive remedies of replacement or restitution. On that basis, it is void as against public policy, and Nissan is not entitled to summary judgment on grounds the Release bars Rheinhart's claims as a matter of law.

26

We emphasize that our holding is not that section 1790.1 precludes settlement and release of claims under the Act.  To be sure, there are many instances where parties have settled disputes over a claimed breach of the Act.  (See *Madrigal v. Hyundai Motor America* (2023) 90 Cal.App.5th 385 [stipulated settlement on first day of trial].)  In this respect, we do not disagree with the observations of *McLaren Automotive Inc. v. Shaoo* (C.D.Cal. 2021) 2021 WL 4707001, that a buyer is not precluded from agreeing to settle his claim for a lesser amount than the full purchase price of the vehicle (*id.* at p. *10) and *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Product Liability Litigation* (N.D.Cal. Sept. 8, 2020) 2020 WL 5371404, which generally declined to apply section 1790.1 to settlements or else "no settlement releasing any Song-Beverly Act . . . claim would be enforceable." (*Id.* at p. *6.)

## VI.  *Rheinhart's Unconscionability Argument*

In view of our holding, we need not address Rheinhart's argument that the Release is unconscionable due to his unrepresented status.

## DISPOSITION

The judgment is reversed.  Rheinhart shall recover his costs on appeal.


O'ROURKE, J.

WE CONCUR:


HUFFMAN, Acting P. J.


DO, J.